ATLANTIC COUNTY CIRCUIT COURT.

KATHERINE CRAMER, ADMINISTRATRIX OF ESTATE OF
SARAH FEDNER, DECEASED, PLAINTIFF, v. THE JOHN
HANCOCK MUTUAL LIFE INSURANCE COMPANY OF
BOSTON, MASSACHUSETTS, DEFENDANT.

Decided May 17, 1940.

For the plaintiff, *Joseph B. Kauffman.*

For the defendant, *Cussman & Gottlieb (Ellis L. Gottlieb).*

JAYNE, C. C. J.   This action rested fundamentally upon
two policies of insurance on the life of one Sarah Fedner,
now deceased.   The defendant acknowledged its obligation to
pay to the estate of the deceased the face amount of the poli-
cies.   The controversy related to the claim of the plaintiff
for additional sums of equal amount, commonly known as

double indemnity or accidental death benefits. The factual question was whether the insured sustained bodily injuries solely through external, violent and accidental means which resulted directly and independently of all other causes in her death. The jury resolved this query in the affirmative and rendered a verdict in favor of the plaintiff.

The defendant has a rule to show cause why this verdict should not be annulled and a new trial granted.

True, the burden reposed upon the plaintiff to prove the requisite factual circumstances comprehended by the provisions of the policies. *Travelers' Insurance Co.* v. *McConkey,* 127 *U. S.* 661, 668; 8 *S. Ct.* 1360; 32 *L. Ed.* 308; *Kresse* v. *Metropolitan Life Insurance Co.,* 111 *N. J. L.* 474; 168 *Atl. Rep.* 634; *Kennedy* v. *U. S. Fidelity, &c., Co.,* 113 *N. J. L.* 431; 174 *Atl. Rep.* 531.

Therefore in the consideration of the present application, the interpretation and accepted meaning of the pertinent provisions of the policies become of primary interest. The expression "accidental means" has been employed in certain policies of insurance for many years. The word "accidental" is defined in Webster's Dictionary as "happening by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous; as an accidental visit." 6 *Cooley's Briefs on Insurance (2d ed.)* 5234, defines accidental means as follows: "Strictly speaking, a means is accidental perhaps only when disassociated from any human agency, but this narrow interpretation is not recognized in the law of accident insurance. * * * An effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of such means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, is produced by accidental means." Definitions of like signification are supplied in *Couch, Insurance,* § 1137; *Vance, Insurance* 871; 1 *C. J.* 425, 427.

It is noticeable that the courts of our sister states and our federal courts have been called upon more frequently to interpret the expression "accidental means." The case to

which most of such authorities refer, is *U. S. Mutual Accident Association* v. *Barry,* 131 *U. S.* 100; 9 *S. Ct.* 755, 762; 33 *L. Ed.* 60, 67, wherein the following instructions were appproved: "If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

Nevertheless, an examination of the reported cases reveals that from this statement of the law two somewhat diverse views have developed. The one procession of cases hold that, where an unusual or unexpected result occurs by reason of the commission of an intentional act by the insured, where no mischance, slip or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used were accidental, and it is not enough that the result may be unusual, unexpected or unforeseen. This view is lucidly expressed in *Kimball* v. *Massachusetts Accident Co.,* 44 *R. I.* 264; 117 *Atl. Rep.* 228, 230; 24 *A. L. R.* 726. It is said that accidental means and accidental cause are synonymous expressions. *Caldwell* v. *Travelers Insurance Co.,* 305 *Mo.* 619; 267 *S. W. Rep.* 907; 39 *A. L. R.* 56, 80; *Bryant* v. *Continental Casualty Co.,* 107 *Tex.* 582; 182 *S. W. Rep.* 673; *L. R. A.* 1916E, 945, 949. The distinction is made between an accidental death and a death caused by accidental means. See *Olinsky* v. *Railway Mail Association,* 182 *Cal.* 669; 189 *Pac. Rep.* 835, 837; 14 *A. L. R.* 784, 786. Other cases are: *Fane* v. *National Association, Railway Postal Clerks,* 197 *App. Div.* 145; 188 *N. Y. S.* 222, 223; *Husbands* v. *Indiana Travelers Accident Association,* 194 *Ind.* 586; 133 *N. E. Rep.* 130; 35 *A. L. R.* 1184; *Fulton* v. *Metropolitan Casualty Co.,* 19 *Ga. App.* 127; 91 *S. E. Rep.* 228, 229; *Curry* v. *Federal Life Insurance Co.,* 221 *Mo. App.* 626; 287 *S. W. Rep.* 1053; *Smith* v. *Travelers Insurance Co.,* 219 *Mass.* 147, 149; 106 *N. E. Rep.* 607; *L. R. A.* 1915B, 812; *Cobb* v. *Preferred Mutual Accident Association,* 96 *Ga.* 818; 22 *S. E. Rep.* 976; *Whitehead* v. *Railway Mail Association* (*C. C. A.*),

269 *Fed. Rep.* 25; *certiorari* denied, 253 *U. S.* 570; 41 *S. Ct.* 375; 65 *L. Ed.* 791; *Southard* v. *Railway Pass. Assur. Co.,* 34 *Conn.* 574, 576, 578; *Fed. Cas. No.* 13, 182; *Stone* v. *Fidelity and Casualty Co.,* 133 *Tenn.* 672; 182 *S. W. Rep.* 252; *L. R. A.* 1916D, 536, 538; *Ann. Cas.* 1917A, 86; *Carswell* v. *Railway Mail Association (C. C. A.),* 8 *Fed. Rep.* (2d) 612; *Martin* v. *Interstate Business Men's Accident Association,* 187 *Iowa* 869; 174 *N. W. Rep.* 577, 578; *Appel's Case,* 86 *App. Div.* 83; 83 *N. Y. S.* 238; *Metropolitan Life Insurance Co.* v. *Landsman (Del. Super.),* 165 *Atl. Rep.* 563, 567; *Shanberg* v. *Fidelity and Casualty Co. (C. C. A.),* 158 *Fed. Rep.* 1, 5; 19 *L. R. A. (N. S.)* 1206; *Pledger* v. *Business Men's Accident Association (Tex. Civ. App.),* 197 *S. W. Rep.* 889, 891; *Rock* v. *Travelers Insurance Co.,* 172 *Cal.* 462; 156 *Pac. Rep.* 1029; *L. R. A.* 1916E, 1196; *Feder* v. *Iowa State Trav. Men's Association,* 107 *Iowa* 538; 78 *N. W. Rep.* 252; 43 *L. R. A.* 693, 695; 70 *Am. St. Rep.* 212; *New Amsterdam Casualty Co.* v. *Johnson,* 91 *Ohio St.* 155; 110 *N. E. Rep.* 475; *L. R. A.* 1916B, 1018; *Lehman* v. *Great Western Accident Association,* 155 *Iowa* 737; 133 *N. W. Rep.* 752; 42 *L. R. A. (N. S.)* 562, 567; *Ogilvie* v. *Aetna Life Insurance Co.,* 189 *Cal.* 406; 209 *Pac. Rep.* 26; 26 *A. L. R.* 116, 120; *Clarkson* v. *Union Mutual Casualty Co.,* 201 *Iowa* 1249; 207 *N. W. Rep.* 132, 133; *Smouse* v. *Iowa Trav. Men's Association,* 118 *Iowa* 436; 92 *N. W. Rep.* 53, 54.

The other column of cases hold that, where injury or death is the unusual, unexpected or unforeseen result of an intentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, or other unusual or extraordinary circumstance in the act or event which caused such injury or death. Comprehensive statements of this persuasion may be discovered in *Western Commercial Travelers Association* v. *Smith (C. C. A.),* 85 *Fed. Rep.* 401, 405; 40 *L. R. A.* 653, 656; *Lickleider* v. *Iowa Traveling Men's Association,* 184 *Iowa* 123; 166 *N. W. Rep.* 363, 366; 168 *N. W. Rep.* 884; 3 *A. L. R.* 1295, 1300, 1301. Compare, however, with the foregoing citations the following cases from the same state: *Lehman* v. *Great Western Acci-*

*dent Association,* 155 *Iowa* 737; 133 *N. W. Rep.* 752, 753; 42 *L. R. A. (N. S.)* 563; *Carnes* v. *Iowa State, &c., Association,* 106 *Iowa* 281; 76 *N. W. Rep.* 683; 68 *Am. St. Rep.* 306. Many cases may be taken from the reports which seem to hold that "accidental means" simply implies "means" producing a result which is not the natural and probable consequence of such means. The following citations are illustrative: *Mehaffey* v. *Provident Life and Accident Insurance Co.,* 205 *N. C.* 701; 172 *S. E. Rep.* 331, 333; *Losleben* v. *California State Life Insurance Co.,* 133 *Cal. App.* 550; 24 *Pac. Rep.* (2d) 825, 826; *Robinson* v. *U. S. Health and Accident Insurance Co.,* 192 *Ill. App.* 475, 477, 478; *Fidelity and Casualty Co.* v. *Stacey's Ex'r (C. C. A.),* 143 *Fed. Rep.* 271; 5 *L. R. A. (N. S.)* 657, 661; 6 *Ann. Cas.* 955; *Horan* v. *Prudential Insurance Co.,* 104 *Pa. Super.* 474; 159 *Atl. Rep.* 69, 70; *Gohlke* v. *Hawkeye Commercial Men's Association,* 198 *Iowa* 144; 197 *N. W. Rep.* 1004; 35 *A. L. R.* 1177, 1183; *Carter* v. *Standard Accident Insurance Co.,* 65 *Utah* 465; 238 *Pac. Rep.* 259; 41 *A. L. R.* 1495, 1518, 1519; *Hodgson* v. *Preferred Accident Insurance Co.,* 100 *Misc.* 155; 165 *N. Y. S.* 293, 297; *Inter-Ocean Casualty Co.* v. *Jordan* (1933), 227 *Ala.* 383; 150 *So. Rep.* 147, 148; *Horsfall* v. *Pacific Mutual Life Insurance Co.,* 32 *Wash.* 132, 135; 72 *Pac. Rep.* 1028; 63 *L. R. A.* 425; 98 *Am. St. Rep.* 846; *New York Life Insurance Co.* v. *Gustafson (C. C. A.)* 55 *Fed. Rep.* (2d) 236, 237; 82 *A. L. R.* 729; *Young* v. *Railway Mail Association,* 126 *Mo. App.* 325; 103 *S. W. Rep.* 557, 563; *Moutzoukos* v. *Mutual Ben. Association,* 69 *Utah* 309; 254 *Pac. Rep.* 1005, 1007, 1008; *Aetna Life Insurance Co.* v. *Brand (C. C. A.),* 265 *Fed. Rep.* 6; 13 *A. L. R.* 657, 660; *certiorari* denied, 253 *U. S.* 496; 40 *S. Ct.* 587; 64 *L. Ed.* 1031; *Schleicher* v. *General Accident, &c., Corp.,* 240 *Ill. App.* 247, 253; *Horton* v. *Travelers Insurance Co.,* 45 *Cal. App.* 462; 187 *Pac. Rep.* 1070, 1071; *Mutual Life Insurance Co.* v. *Dodge (C. C. A.),* 11 *Fed. Rep.* (2d) 486; 59 *A. L. R.* 1290; *Continental Casualty Co.* v. *Willis (C. C. A.),* 28 *Fed. Rep.* (2d) 707, 709; 61 *A. L. R.* 1069; *Townsend* v. *Commercial Travelers Accident Association,* 231 *N. Y.* 148; 131 *N. E. Rep.* 871; 17 *A. L. R.* 1001, 1004; *Woods*

v. *Provident, &c., Co.,* 240 *Ky.* 398; 42 *S. W. Rep.* (2d) 499, 501; *Zurich General Accident, &c., Co.,* v. *Flickinger* (*C. C. A.*), 33 *Fed. Rep.* (2d) 853, 854; 68 *A. L. R.* 161; *Grosvenor* v. *Fidelity and Casualty Co.,* 102 *Neb.* 629; 168 *N. W. Rep.* 596, 597.

Indeed there are cases which hold that death having been caused through external and violent means, it will be presumed that the death was caused by accidental means. *Baciocco* v. *Prudential Insurance Company of America,* 22 *Fed. Rep.* (2d) 700, 702; *affirmed,* 29 *Id.* 966; *certiorari* denied, 279 *U. S.* 854; *Standard Life and Accident Insurance Co.* v. *Thornton* (*C. C. A.*), 100 *Fed. Rep.* 582; *Preferred Accident Insurance Co.* v. *Fielding,* 35 *Colo.* 19; 83 *Pac. Rep.* 1013; 9 *Ann. Cas.* 916; *Fort Worth Mutual Benevolent Association* v. *Jennings* (*Tex. Civ. App.*), 283 *S. W. Rep.* 910; *Buckley* v. *Massachusetts Bonding and Insurance Co.,* 113 *Wash.* 13; 192 *Pac. Rep.* 924; *Postler* v. *Travelers Insurance Co.,* 173 *Cal.* 1; 158 *Pac. Rep.* 1022; *Withers* v. *Pacific Mutual Life Insurance Co.,* 58 *Mont.* 485; 193 *Pac. Rep.* 566; *Watkins* v. *Reliance Life Insurance Co.,* 152 *Ark.* 12; 238 *S. W. Rep.* 10; *Aetna Life Insurance Co.,* v. *Little,* 146 *Ark.* 70; 225 *S. W. Rep.* 298.

In our own state no such presumption is recognized. *Kresse* v. *Metropolitan Life Insurance Co., supra.* The existence of such a presumption is also denied in other jurisdictions. *Watkins* v. *Prudential Insurance Co.,* 315 *Pa.* 497; 173 *Atl. Rep.* 644; 95 *A. L. R.* 869; *Grosvenor* v. *Fidelity and Casualty Co., supra; Merrett* v. *Preferred Masonic Mutual Accident Association of America,* 98 *Mich.* 338; 57 *N. W. Rep.* 169; *Farmers' Loan and Trust Co.* v. *Siefke,* 144 *N. Y.* 354; 39 *N. E. Rep.* 358, 359; *Johns* v. *Northwestern Mutual Relief Association,* 90 *Wis.* 332; 63 *N. W. Rep.* 276, 277; 41 *L. R. A.* 587; *Keefer* v. *Pacific Mutual Life Insurance Co.,* 201 *Pa.* 448; 51 *Atl. Rep.* 366, 367; 88 *Am. St. Rep.* 822; *Hill* v. *Central Accident Insurance Co.,* 209 *Pa.* 632; 59 *Atl. Rep.* 262, 263.

Mr. Justice Cardozo remarked in his dissenting opinion in *Landress* v. *Phoenix Mutual Life Insurance Co.,* 291 *U. S.* 491; 54 *S. Ct.* 461, 463; 78 *L. Ed.* 934; 90 *A. L. R.* 1382:

"The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog."

The definition of "accidental means" composed in the *Barry* case, *supra,* 131 *U. S.* 100, 121, has been endorsed by our Court of Errors and Appeals. *Lower* v. *Metropolitan Life Insurance Co.,* 111 *N. J. L.* 426; 168 *Atl. Rep.* 592. The meaning of the Barry case seems now to have been rendered indubitable by the decision in *Landress* v. *Phoenix Mutual Life Insurance Co., supra,* 291 *U. S.* 491. Mr. Justice Stone, speaking for the court stated: "But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unsuspected, extraordinary, an unlooked for mishap and so an accident,' * * * for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental." The case related to one who suffered a sunstroke while playing golf and the court held that the death of the insured did not result from accidental means. The conflict in authority is well illustrated in cases where death or injury has occurred from sunstroke or heat prostration. *Lower* v. *Metropolitan Life Insurance Co., supra; Continental Casualty Co.* v. *Pittman,* 145 *Ga.* 641; 89 *S. E. Rep.* 716; *Pack* v. *Prudential Casualty Co.,* 170 *Ky.* 47; 185 *S. W. Rep.* 496; *L. R. A.* 1916E, 952, 956; *Bryant* v. *Continental Casualty Co., supra; Continental Casualty Co.* v. *Clark,* 70 *Okl.* 187; 173 *Pac. Rep.* 453; *L. R. A.* 1918F, 1007, 1011; *Elsey* v. *Fidelity and Casualty Co.,* 187 *Ind.* 447; 120 *N. E. Rep.* 42; *L. R. A.* 1918F, 646, 648; *Richards* v. *Standard Accident Insurance Co.,* 58 *Utah* 622; 200 *Pac. Rep.* 1017; 17 *A. L. R.* 1183; *Hawkinson* v. *Order of United Commercial Travelers (Tex. Civ. App.),* 20 *S. W. Rep.* (2d) 101; *Higgins* v. *Midland Casualty Co.,* 281 *Ill.* 431, 439; 118 *N. E. Rep.* 11; *U. S. Fidelity, &c., Co.* v. *Hoflinger,* 185 *Ark.* 50; 45 *S. W. Rep.*

(2d) 866, 867; *Continental Casualty Co.* v. *Bruden,* 178 *Ark.* 683; 11 *S. W. Rep.* (2d) 493; 61 *A. L. R.* 1192, 1195; *Annotations* 7 *A. L. R.* 1132; 17 *A. L. R.* 1183; 61 *A. L. R.* 1197.

However, the distinction between accidental means and accidental result has been generally recognized in consequence of the chosen language of the policies.

"In determining that an injury occurred by 'accidental means,' it should appear that the cause or means governed the result, and not the result the cause; and that, however unexpected the result might be, no recovery could be allowed under such a provision, unless there was something unexpected in the cause or means which produced the result." *Kimball* v. *Massachusetts Accident Co., supra.*

Our own courts recognize this distinction between an injury that is accidental and one that is caused by accidental means. *Lower* v. *Metropolitan Life Insurance Co., supra; Lawrence* v. *Massachusetts Bonding, &c., Co.,* 113 *N. J. L.* 265; 174 *Atl. Rep.* 226; *Kennedy* v. *U. S. Fidelity, &c., Co., supra,* and where the injury is the probable result of a deliberate act. *Wiley* v. *Travelers' Insurance Co.,* 119 *N. J. L.* 22; 194 *Atl. Rep.* 59.

Turning, now, to the case under review, the evidence disclosed that the insured was engaged in preparing a quantity of chicken soup in the kitchen of her home. The liquid and other ingredients were deposited in a covered aluminum cooking pot which was placed upon the gas stove for heating and boiling. The burner beneath the container was ignited and subsequently the aluminum kettle exploded, casting the boiling soup and fragments of the pot itself about the room and upon the insured. The insured was burned.

Assuredly, this is a case where, in the act which preceded the injury, something unforeseen, unexpected, and unusual occurred which produced the injury. The insured in such circumstances sustained bodily injury (the burns) solely through external, violent and accidental means. Bodily injury is said to be a localized abnormal condition of the living body. *Linnane* v. *Aetna Brewing Co.,* 91 *Conn.* 158, 162; 99 *Atl. Rep.* 507; *L. R. A.* 1917D, 77; *King* v. *Travelers*

*Insurance Co.,* 192 *Atl. Rep.* 311. The term "violent" signifies merely that a physical force, however slight, is efficient in producing a harmful result. *Lower* v. *Metropolitan Life Insurance Co., supra; Arnstein* v. *Metropolitan Life Insurance Co.,* 196 *Atl. Rep.* (*Pa.*) 491, 493; *Paul* v. *Travelers Insurance Co.,* 112 *N. Y.* 472; 20 *N. E. Rep.* 347; 3 *L. R. A.* 443; *Paist* v. *Aetna Life Insurance Co., D. C.,* 54 *Fed. Rep.* (*2d*) 393; *Thalassinos* v. *Massachusetts Accident Co.,* 84 *N. H.* 261; 149 *Atl. Rep.* 512; *Lane* v. *Horn & Hardart Baking Co.,* 261 *Pa.* 329, 335; 104 *Atl. Rep.* 615; 13 *A. L. R.* 963.

It was incumbent upon the plaintiff to also prove that the bodily injury thus sustained resulted directly and independently of all other causes in the death of the insured. The bodily injury so occasioned must be an efficient and proximate cause of death. *Kelly* v. *Pittsburgh Casually Co.,* 100 *Atl. Rep.* (*Pa.*) 494, 495.

The policies of insurance also stipulated that "No accidental Death Benefit will be paid * * * if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity." The words "bodily infirmity" or "disease" as used in policies of insurance are construed to be practically synonymous. The term "bodily infirmity" has uniformly been taken to mean a condition of a settled and substantial character materially impairing the bodily functions and processes and not to embrace minor physical deficiencies and ailments which are frequent and common incidents of life. In *Silverstein* v. *Metropolitan Life Insurance Co.,* 254 *N. Y.* 81; 171 *N. E. Rep.* 914, 915, it was laconically declared: "A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules."

Yet, it must be realized that the stipulations embodied in the policies are restrictions on the right of redress of the insured against the insurer. The express and unambiguous terms of the policy contract cannot be ignored. Where, as here, the insured was afflicted with a disease or bodily infirmity within the meaning of the policy, the question usually arises whether the accidental injury resulted directly

and independently of all other causes in the death of the insured and whether the death was "caused or contributed to, directly or indirectly, or wholly or partialy by disease or by bodily infirmity." The plaintiff cannot recover if the cause of death is left to mere conjecture. *Stauffer* v. *Susquehanna Collieries Co.,* 176 *Atl. Rep. (Pa.),* 740, 742.

In *Runyon* v. *Monarch Accident Insurance Co.,* 108 *N. J. L.* 489; 158 *Atl. Rep.* 530, the Court of Errors and Appeals was concerned with a policy which limited the liability of the insurer to death resulting "exclusively from bodily injuries caused solely by external, violent and accidental means." Mr. Justice Trenchard in delivering the opinion stated: "The instruction was well within the general rule that, under such a policy, if the insured, at the time of the accidental injury, was also suffering from a disease, and the disease aggravated the effects of the accident, and actively contributed to the death occasioned thereby, there can be no recovery upon the policy."

In the recent case of *Kelly* v. *Prudential Life Insurance Co.* (1939), 334 *Pa.* 143; 6 *Atl. Rep.* (*2d*) 55, Mr. Justice Maxey, in ruling on similar policy provisions, approved the following charge: "The law is that if a disease, while existing, be but a condition and the accident the moving, sole and proximate cause of death, the exception in the policy will not relieve the insurer for death so caused. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease and low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury * * *." The justice continued on page 59: "It is clear that if the physical condition of the insured is merely weakened or his resistance to disease lowered by a pre-existing ailment or disease incident to advanced age, which creates a bodily condition of a passive nature not alone sufficient to cause death, this fact will not prevent recovery for death resulting from accidental means under an insurance policy providing indemnity there-

for, even though death resulting indirectly from bodily or mental infirmity or disease is excluded as a risk, provided the accident sets in progress the chain of events leading directly to death."

The phrase "resulting directly and independently of all other causes in the death" undoubtedly refers to the efficient cause of death at the time it occurs. Simply stated, it means the proximate cause. We speak of the proximate cause as being the cause that naturally and probably led to the result; the cause that in the existing conditions would be reasonably expected to produce the result; the cause which in natural and continuous sequence, unbroken by any efficient intervening cause produces the result and without which the result would not have occurred. "Proximate Cause," "Remote Cause," "Reasonable Interpretation" and "Intention of the Parties" are all terms that have been considered in the treatment of this subject. Many pertinent decisions are cited in *Preferred Accident Insurance Company of New York* v. *Combs, 76 Fed. Rep. (2d)* 775; *Scanlan* v. *Metropolitan Life Insurance Co., 93 Fed. Rep. (2d)* 942. To construe these accident policies too strictly would likely thwart the general object of the insurance and ultimately subserve neither the purposes of the insurers, nor the insured. To further study the views of the state courts on the general subject just discussed, see Notes 25 *Mich. L. Rev.* 467 and 803; 26 *Ill. L. Rev.* 344; 19 *Minn. L. Rev.* 244.

Since the insured in the present case was affected with arteriosclerosis, it is not inappropriate to note that pertinent decisions may be found in the annotations in 3 *A. L. R.* 1304 and 82 *A. L. R.* 1411.

Now in the case at hand, the defendant protests that the determination of the jury relative to the cause of the death of the insured was manifestly discordant with the weight of the evidence. This is the most imposing point in support of the application for a new trial. The evidence concerning this branch of the case has been intently examined. Some of the significant facts were not in dispute. The mishap occurred on February 12th, 1939. The insured was discharged from the hospital on March 21st, 1939, and died on April 15th,

1939. The certificate of death signed by Dr. Samuel A. Shuster who attended the insured immediately before her death evinces that the cause of death was "cerebral hemorrhage (apoplexy) arteriosclerosis, contributory cause." The proof of claim for normal death benefits addressed to the defendant under date of April 15th, 1939, states the cause of death to have been "cerebral hemorrhage (apoplexy) and the contributing cause of death (arteriosclerosis and hypertension)." The claim for accidental death benefits under date of May 1st, 1939, declares cerebral hemorrhage to have caused the death of the insured and a contributory cause of death is therein said to have been "accidental burns (of face and arms)." Notwithstanding the filing of such proofs of death the plaintiff was not estopped from proving, if able, that the death was, in fact, caused by accidental means. *Home Benefit Association* v. *Sargent,* 142 *U. S.* 691; 12 *S. Ct.* 332; 35 *L. Ed.* 1160; *Pythias' Knights' Supreme Lodge* v. *Beck,* 181 *U. S.* 49; 21 *S. Ct.* 532; 45 *L. Ed.* 741; *Jensen* v. *Continental Life Insurance Co.,* 28 *Fed. Rep.* (*2d*) 545; *Annotations,* 93 *A. L. R.* 1342.

The death certificate and proofs of death, signed by Dr. Shuster, are, however, expository of his conclusion at the time of the demise of the insured. After claim was presented to the defendant for accidental death benefits, Dr. Shuster addressed a letter to the defendant in which he wrote "In my opinion, there is no question but that the burns which the deceased suffered were a definite contributing cause to her death." When, at the trial, he was given a history of all relevant antecedent conditions and events as an hypothesis and asked to express an opinion concerning the cause of death, he replied "I am still not certain." Such perplexity had no probative force.

The plaintiff leans chiefly upon the testimony of the expert witness, Dr. Isaac Stalberg, who expressed the opinion that the accidental burns caused the death of the insured, directly and independently of all other causes. An hypothetical question having been propounded, he was asked: "*Q.* Can you say with reasonable certainty what the cause of death was? *A.* With absolute certainty. *Q.* What in your opinion was

the cause of death? *A.* In my opinion she died as a result of the burn or scald wounds that she received on February 12th or 15th, whatever the date is." The following explanatory answers were given on cross-examination: "*A.* I said that whole condition, the chart and the suffering she underwent, and I know the end results of burns. A man or a woman can suffer only a certain amount of pain, whether mental, physical or otherwise, then eventually something happens and they die. They get well and they die, too, and it is logical to conclude, I mean theoretically, that the woman died as the result of the burns." ."*A.* The end result of the burns, the burns inflicted on her body destroyed the tissue, destroyed the nerve ends and gave her the pain, and then I believe, too, that it may be that an emboli broke through." "*A.* He came in there and she had the symptoms of what we call an apoplexy or stroke. The end had come. In all probability that can come from one of several things, from an emboli breaking loose from the wound, from a thrombus or from some end defect in the blood that we get in burns, or from the bursting of one of the vessels in the brain. All of these things are conjecture. I can believe one thing, Dr. Shuster another thing and Dr. Johnson another and we may all be right or wrong, but we are giving our honest opinion." "*A.* The pain of mental suffering, the breaking down of her vascular system, the possible lodging of an emboli or aortal thrombus and the weakening down of the whole condition after six, seven or eight weeks of suffering." "*A.* If she had died from a heart condition she had many contributing factors in the last quarter century that would have contributed toward it. I go by the study of the whole case, by a conception of the entire situation, and I say honestly and sincerely that that whole heart condition had absolutely nothing to do with her death in April when she died."

The witnesses, Dr. Carl A. Surran, Dr. V. Earl Johnson and Dr. Roland T. Hellebranth were in discord with Dr. Stalberg on this aspect of the case. Dr. Surran was summoned to treat the insured in June, 1934. He resolved that she was then suffering from auricular fibrillation and decompensation of the heart. Her breathing was heavy, her feet

and face were swollen and she was immediately taken to the hospital. A diagnosis of auricular fibrillation and chronic myocarditis was there confirmed. The patient remained at the hospital eleven days. For some period thereafter digitalis was administered to her. Dr. Surran is the official physician and surgeon for the members of the Atlantic City fire department and has had an extensive experience in the observance and professional treatment of bodily burns from those of first degree to carbonization. It was his conviction that the burns did not in anywise cause the cerebral hemorrhage from which, in his judgment, the insured died.

Dr. Hellebranth treated the insured for coronary sclerosis and generalized hardening of the arteries from August, 1935, to September, 1938. He asserted that this infirmity was serious and progressive and that coronary thrombosis or cerebral hemorrhage were results to be reasonably anticipated. Incidentally, he was called to the home of the insured to consult with Dr. Shuster on April 15th, 1939, where he again was afforded an opportunity to observe the insured's physical condition. He expressed the conclusion that the cause of death was a cerebral hemorrhage superinduced by arteriosclerosis involving the so-called basilar artery.

This testimony was materially aggrandized by the statements of Dr. Johnson who is chief in surgery at the Atlantic City Hospital and who there medically treated the insured for her accidental injuries. The insured was admitted to the hospital on February 12th, 1939, and discharged on March 21st, 1939. She thereafter occasionally consulted Dr. Johnson at his office up to a few days before her death. While at the hospital on this occasion it was again ascertained that she was also suffering from auricular fibrillation, a chronic cardiac disturbance. The following excerpts epitomize the testimony of Dr. Johnson: "Q. Doctor, what is the dangerous period in burns? A. The first forty-eight hours and during the tenth day to the twenty-first. During the first forty-eight hours from shock and the absorption of toxins, and from the tenth to the twenty-first day as a result of absorption from infection of the burn. If they get through those two periods we are not concerned about the question

of life and death. *Q*. She did get over those periods? *A*. She was discharged the thirty-seventh day. *Q*. From your knowledge of the case, would you give us your opinion as to whether or not these burns which Mrs. Fedner suffered and for which you treated her resulted directly and independently of any other cause in her death? *A*. They did not. *Q*. Why do you say that, doctor? *A*. To start with, on April 11th, when I saw Mrs. Fedner last her burns were practically entirely healed. She had just a few little small areas, I think about three about the size of my small finger nail, that hadn't completely epithelialized over. I can't quite see how a burn that has practically recovered would cause a person to die. One might bring up the question of toxemia from that burn. It is over then. From the standpoint of infection, all right, she has a little bit of infection on each one of those little small areas, but she is not getting absorption from that to make anybody sick, particularly kill him. The only other possibility one would think of is embolus. Embolus can originate from a burn. The embolus does not originate from a practically healed burn, it originates from an infected burn at a time when the emboli, or at least when the infection has caused a certain amount of involvement of the veins in that region, they get infection of the veins and thereby have a reason for an embolus dislodging itself. If an embolus came from the arms or the legs of the body it doesn't go to the brain, it goes to the lung, because it has to go through the right side of the heart. There is no other way to get from the right side of the heart to the brain. Most of the emboli that cause sudden death, that lodge in the brain, come from the heart itself, and it has to come from the left side, not the right side. So therefore I say that for all those reasons, that the burn did not cause her to die."

Where the testimony of expert witnesses substantially comprises the evidence concerning an essential controversial issue, the court, upon an application for a new trial upon the ground that the verdict is against the weight of the pertinent evidence, must evaluate the substance and credibility of such evidence. *Barry* v. *Pennsylvania Railroad Co.*, 65 *N. J. L.* 407; 47 *Atl. Rep.* 464; *Deal* v. *Garber Ice Cream Co.*, 9

*N. J. Mis. R.* 730; 155 *Atl. Rep.* 466; *Kennedy* v. *U. S. Fidelity, &c., Co., supra.*

The cause of death, in the absence of demonstrative evidence, is often problematical. The power to grant a new trial is remedial in character and the propriety of each verdict must be judged in the light of the evidence adduced. Reflecting upon the indispensable factual circumstances which the plaintiff was obliged to establish, appraising the testimony of the witnesses and attributing due significance to the pre-existing condition of the insured, and the span of time between the accident and the death of the insured, it seems evident that the verdict of the jury was not in conformity with the weight of the evidence. At the trial the circumstances of the accident were dramatically described in tears by the members of the insured's family. At such times an atmosphere of lamentation pervaded the court room. The impropriety of the verdict may be reasonably ascribed to the influence of sympathy.